IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

MELTECH CORPORATION, INC.　　　*　　Case No. 8:11-cv-00160-AW

　　　　　　　　　　　　　　　　*

　　　Plaintiff

　　　　　　　　　　　　　　　　*

v.

　　　　　　　　　　　　　　　　*

AUSTIN MOHAWK & CO., INC.,
ET AL.　　　　　　　　　　　　　*

　　　　　　　　　　　　　　　　*

　　　Defendants　　　　　　　　*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF THE CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS AUSTIN MOHAWK'S AND BEECHGROVE CONSTRUCTION INC.'S  MOTION FOR SUMMARY JUDGMENT

Plaintiff, by undersigned counsel, submits the following Cross-Motion for Summary Judgment, Memorandum in Support, and Opposition to Defendants Austin Mohawk's and Beechgrove Construction Inc.'s ("Beechgrove") Motion for Summary Judgment[1] and states the following:

1.　This case centers on an accident at a construction site that was caused by Defendants' various breaches of contracts and acts of negligence.

2.　The majority of the material facts are undisputed and weight heavily in favor of summary judgment for the Plaintiff.　That is, the material undisputed facts demonstrate that Defendants acted negligently, breached their contracts with the Plaintiff, and breached myriad

---

[1] Plaintiff incorporates the arguments set forth herein against Defendant White.

1

industry standards in causing an accident that killed a man and caused Plaintiff, a woman-owned,

small business construction company, to suffer significant injuries.

    3.   Similarly, those same material undisputed facts also demonstrate why the

Motion for Summary Judgment filed by Defendants Austin Mohawk and Beechgrove should be

denied.

    4.   For these and the reasons that follow, Plaintiff respectfully requests that this

Honorable Court enter summary judgment in its favor and deny the Motion for Summary

Judgment filed by Defendants Austin Mohawk and Beechgrove.

                              Respectfully submitted,

                              */s/ Craig S. Brodsky*
Craig S. Brodsky (Bar #23939)
George S. Mahaffey (Bar # 15083)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, MD 21201
(410) 783-4000 (phone)
(410) 783-4040 (fax)
csb@gdldlaw.com
gsm@gdldlaw.com
***Attorneys for Plaintiff***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

MELTECH CORPORATION, INC.          *          Case No. 8:11-cv-00160-AW

                                   *

      Plaintiff                    *

v.                                 *

AUSTIN MOHAWK & CO., INC.,          *
ET AL.

                                   *

                                   *

      Defendants                   *
*************************************************************

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF THE CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS AUSTIN
MOHAWK'S AND BEECHGROVE CONSTRUCTION INC.'S
MOTION FOR SUMMARY JUDGMENT**

     Plaintiff, by undersigned counsel, submits the following Memorandum of Law in Support

of Cross-Motion for Summary Judgment and Opposition to Defendants Austin Mohawk's and

Beechgrove Construction Inc.'s ("Beechgrove") Motion for Summary Judgment and states the

following:

**I.    INTRODUCTION**

     At its core, this case is about the failure of the Defendants to honor their contractual

obligations and take responsibility for their actions, which led to an accident on a construction

site that caused a man to lose his life and the Plaintiff to suffer significant damages as a result

thereof.  The events that caused the accident are not generally in dispute.  Neither is the identity

of those engaged in the activities that resulted in the accident, namely Third-Party Defendant

Robert White Construction ("White"), and Defendants Austin Mohawk and Beechgrove.

1

Defendants Austin Mohawk and Beechgrove seem to think that they are insulated from liability because they hired White to do certain work, but their own documents and correspondence directly demonstrate otherwise. Indeed, the documents clearly show that Defendants Austin Mohawk and Beechgrove were intimately involved in overseeing the negligent work done by White. For these and the reasons that follow, Partial Summary Judgment should be entered in favor of Plaintiff and the Motion for Summary Judgment filed by Defendants Austin Mohawk and Beechgrove should be denied.

## II.    BRIEF FACTUAL OVERVIEW OF THE CASE[2]

Plaintiff Meltech is a local construction company that hired Defendant Austin Mohawk and Beechgrove to manufacture, furnish, and install a canopy at the main gate at Patuxent River Naval Air Station, Pax Gate 1 (the "Project"). Unbeknownst to Plaintiff and contrary to Defendants' assertions, Austin Mohawk and Beechgrove improperly hired Third-Party Defendant White to actually erect the canopy. By their own guidelines, policies and procedures, as well as their subcontract(s) with Plaintiff, Austin Mohawk and Beechgrove were solely responsible for all of the work that White did. White admittedly acted negligently, violated a number of federal, state, local regulations, and breached industry standards while on the job, (along with violating the Austin/Beechgrove subcontracts with Plaintiff), and one of White's employees was killed in an accident. The United States Government, via Occupation Safety and Health Administration ("OSHA"), investigated the death of White's employee and found that White was solely at fault. Significantly, OSHA did not find that Plaintiff had done anything wrong on the job site. As a result of the death of Ronald Halferty, White's employee, a stop

---

[2] Defendants omitted a significant amount of key background facts in their Motion for Summary Judgment so Plaintiff has provided them in detail below.

work order was issued for the Project, Plaintiff's outstanding reputation was severely damaged, and Plaintiff suffered significant direct and delay damages.

## III.    FULL FACTUAL BACKGROUND

### The Parties

Plaintiff Meltech is a local Prince George's County, Maryland small business that is owned and operated by Joanne Krishack.  For more than ten years, Ms. Krishack has endeavored with her family to grow her small business and develop relationships with a number of corporations and other affiliated entities, including the United States Government and the Naval Facilities Engineering Command ("NAVFAC").  Stephan Krishack, Ms. Krishack's son, testified at deposition that Plaintiff worked long and hard to develop its reputation:

> Q:    How did Meltech become a sole source contractor for NAVFAC?
> A:    Through business development and marketing efforts.

*See* Depo of Stephan Krishack at 187, attached hereto as Exhibit 1.

> Q:    Okay, do you remember how – what business development efforts took place in order to obtain a sole source contract with NAVFAC?
> A:    It was business development and marketing efforts on the part of Joanne and myself and other members of the Meltech team.
> Q:    What were those efforts?
> A:    Everything from federal small business events, marketing and outreach events, presentations to NAVFAC, cold calling.

*See* Depo of Stephan Krishack at 188, attached hereto as Exhibit 2.

### The Contract

Plaintiff's relationship with NAVFAC began in 2006 with a job at the Quantico military base.  In May of 2007, Plaintiff was awarded a contract from NAVFAC for the Naval Air Station at Patuxent River, Maryland ("Pax River").  This case centers primarily on a 2009 NAVFAC

## TABLE OF CONTENTS

**Plaintiff's Memorandum In Support of the Cross-Motion for Summary Judgment and Opposition to Defendants Austin Mohawk's and Beechgrove Construction, Inc.'s Motion for Summary Judgment**

**Page**

I.   Introduction......................................................................... 1

II.  Brief Factual Brief Overview of the Case...................................... 2

III. Full Factual Background.......................................................... 3

    The Parties......................................................................... 3
    The Contract........................................................................3
    Who Are Defendants Austin Mohawk & Beechgrove.......................... 4
    The Contracts With the Defendants..............................................6
    Who Is Defendant White?.........................................................7
    Defendant White Consciously Ignored All Applicable Standards.............8
    Beechgrove Directly Oversaw White And Instructed It On What Kind
        of Equipment to Use.........................................................8
    The Night of the Accident......................................................... 9
    Aftermath of the Accident........................................................11
    The OSHA Investigation..........................................................11
    Plaintiff Suffers Significant Damages Because of That Accident..............13

IV.  Legal Standard....................................................................13

V.   Material Facts Not in Dispute...................................................14

VI.  Material Facts  in Dispute.......................................................15

VII. Argument...........................................................................16

    A.   Summary Judgment Should Be Entered In Favor of Plaintiff
        On Its Claims Against the Defendants..................................16

        1.   Partial Summary Judgment Should Be Entered Against
            Defendant White In Favor Of Plaintiff Since It Is
            Undisputed That White Breached Industry Standards.........16
        2.   Summary Judgment Should Be Entered In Favor of
            Plaintiff As To The Issue Of The Canopy Being
            Properly Installed...............................................17

i

Page

3.    Summary Judgment Should Be Entered Against
Beechgrove In Favor of Plaintiff On Its Claim For
Breach of Contract Since Beechgrove Had A Duty
To Install The Canopy in Conformance With Industry
Standards...................................................................18

Beechgrove Also Breached Its Contract Because It Did Not Properly
Notify Plaintiff That It Would Be Using A Subcontractor Within The
Time Period Set Forth in the Subcontract.........................................20

4.    Summary Judgment Should Be Entered In Plaintiff's
Favor As To Its Negligence Claim Against Defendants
Austin Mohawk and Beechgrove Since Both Are Liable
For Failing to Properly Oversee the Installation Of
The Canopy...............................................................23

Beechgrove's Safety Policies......................................................24

5.    In The Alternative, Summary Judgment Should Be
Entered In Plaintiff's Favor As To Its Negligence Claim
Against Defendants Austin Mohawk and Beechgrove
Since Both Are Vicariously Liable for Defendant
White's Actions..........................................................25

Beechgrove Exerted Control Over White.......................................26

Beechgrove Developed The Lift Plan...........................................26

Austin & Beechgrove Told White What Kind of Equipment To Use.........27

Austin Mohawk & Beechgrove Had Authority Over White Vis-à-vis
Their Own Internal Rules and Policies...........................................28

6.    Summary Judgment Should Be Entered Against Austin
Mohawk In Favor Of Plaintiff On Its Claim For Negligent
Misrepresentation Since The Undisputed Facts Show
Austin Mohawk Negligently Misrepresented Who Would
Be Installing The Canopy................................................29

7.    Summary Judgment Should Be Entered Against Austin
Mohawk And Beechgrove As To Certain Losses And
Expenses Incurred By Plaintiff, Including Losses That
Must Be Indemnified....................................................29

                                                                  <u>Page</u>

    8.    Summary Judgment Should Be Entered Against Austin
             Mohawk And Beechgrove As To The Issues of Direct
             And Other Damages....................................................30

The Applicable Law Supports Plaintiff's Claims For Lost Profits And
Demonstrates Material Facts Are In Dispute Which Preclude Summary
Judgment Being Entered In Defendants' Favor..................................31

The Facts Support Plaintiff's Claims for Lost Profits..........................33

The Testimony Supports Plaintiff's Claims for Lost Profits....................33

Conclusion............................................................................36

contract to install a series of guard booths and other barriers at Pax Gate 1 ("the Project").[3]
Defendants Austin Mohawk and Beechgrove were subcontractors on the Project.  Defendants
Austin Mohawk and Beechgrove are New York companies and Third-Party Defendant White is
an Indiana sole proprietorship.

### Who Are Defendants Austin Mohawk & Beechgrove?[4]

Austin Mohawk and Beechgrove are interrelated companies, subject to control by the
same corporate officers, that work in tandem.  John B. Millet, Jr. is the President of both Austin
Mohawk and Beechgrove.  On its website, Austin Mohawk holds itself out as having spent more
than 80 years building "superior quality prefabricated structures."  *See* website excerpt, attached
hereto as Exhibit 3.  Further, Austin Mohawk represents that it is "known for our breadth of
design options [and] depth of engineering."  *Id.*  Austin Mohawk states, "Our Canopy
Installation Teams working across the lower 48 assure you the same on time delivery and on
time projection completion whether it is in Spokane, San Diego, Raleigh, or Bangor."  *Id.*
Austin Mohawk also states that "[w]e strive to work to high standards and to really be
knowledgeable of the codes and to execute our products to these higher standards."  *Id.*
Unfortunately, in this case, Austin Mohawk did not live up to its lofty goals.

According to Mr. Millet, Beechgrove is responsible for the installation of the canopies
Austin Mohawk sells.  *See* Depo. of John Millet, at 16, attached hereto as Exhibit 4.  Mr. Millet
also testified that Plaintiff could rely on Austin Mohawk and Beechgrove for the installation of
the canopy:

---

[3] During the relevant time period in 2008 and 2009, Plaintiff was awarded four 8(a) sole source
contracts at Pax River, two for 2008 and two for 2009 to install a series of guard booths and
other barriers at Webster Gate and Pax Gate 1, two entrances to Pax River.  This case concerns
the construction at Pax Gate 1.

[4] A significant number of depositions have been taken in the case and much of the testimony,
even from Defendants' witnesses, supports Plaintiff's positions herein.

> Q        And they rely on your representation that it's a warranty and that it's your
>          team that's going to get the canopy installed, right?
>
> A        They rely on us to provide the installation services, correct.

*See* Depo. of John Millet, at 142, attached hereto as Exhibit 4.

Mr. Millet also testified that "Beechgrove was going to provide the installation services to get it [the canopy] erected, that's correct. *Id.* at 143. Thus, Austin Mohawk manufactures/sells the canopies, uses Beechgrove to install them, and Plaintiff was never specifically informed otherwise. The very reason Plaintiff entered into contracts with the Defendants is because they represented they would be doing the work. *See* Exhibit 4. Indeed, Charles Rossi from Meltech stated that it was always contemplated that Beechgrove would do the installation:

> A:       From the very beginning, Austin Mohawk indicated to use directly that
>          Beechgrove Construction would be doing the installation.
> Q:       Did anyone specifically tell you that Beechgrove would not be using
>          subcontractors?
> …
> A:       Using a third-tier subcontractor to install this canopy was never discussed by me
>          at Meltech with anybody at Austin or Beechgrove.
> Q:       It was never discussed at all?
> A:       Never discussed.

*See* Depo. of Charles Rossi at 74-75, attached as Exhibit 5.

Significantly, Beechgrove oversees the companies with whom it works. *See* Depo. of John Millet at 37-38, attached hereto as Exhibit 6. Indeed, Mr. Millet also testified that Beechgrove is ultimately responsible for the canopies it installs via companies like White, *see* Depo of John Millet at 51, attached hereto as Exhibit 7, and that it takes responsibility for jobs that go awry. *See* Depo of John Millet at 88, attached hereto as Exhibit 8. Unfortunately, Mr. Millet and his company have not taken responsibility for their negligence and other acts relating to the accident at issue in this case.

### The Contracts With The Defendants

On February 9, 2009, Plaintiff entered into separate subcontracts with Austin Mohawk and Beechgrove. Plaintiff subcontracted to Austin Mohawk for the materials and delivery to site, and Plaintiff subcontracted to Beechgrove to manage and install the Austin Mohawk canopy system. *See* Ex. 9 (Austin Mohawk Subcontract), Ex. 10 (Beechgrove Subcontract). Stephan Krishack of Meltech testified that Plaintiff hired Defendants for the Project because they held themselves out as experts who would do all of the necessary work:

> A: It was my understanding, and it was Meltech's understanding, project management, estimating, operations, that Austin/Beechgrove were very clear and specific to Meltech that they could meet the entire performance criteria themselves, that Austin would manufacture, that Beechgrove would install, and they were experts in canopies, and we relied on that expertise.

*See* Depo of Stephan Krishack at 160, attached hereto as Exhibit 11.

While originally there was to be one contract only to bind Austin Mohawk and Beechgrove, at the request of Tim Teeter, two separate contracts were written. In its contract, Austin Mohawk represented to Plaintiff that Beechgrove would install the canopy. *See* Exhibit 9. In turn, Beechgrove agreed to install the canopy. It is undisputed that Defendants Austin Mohawk and Beechgrove did not specifically inform Plaintiff of the identity of any additional subcontractors. It is undisputed that Defendants Austin Mohawk and Beechgrove did not inform Plaintiff about what any additional subcontractors would be doing on site and allow Plaintiff time to vet any additional subcontractors. It is undisputed that Mr. Millet was unaware of any conversations between Austin Mohawk and the Plaintiff regarding Defendants' use of subcontractors. (*See* Depo of John Millet at 62, attached hereto as Exhibit 12).

In line with the above and as part of the contracts, Beechgrove and Austin Mohawk were required to supply and install the canopy in conformance with industry standards, provide

certificates of insurance, and indemnify Plaintiff for certain losses.   At no point prior to execution of the subcontracts did either Austin Mohawk or Beechgrove notify Meltech that someone other than Beechgrove would actually install the canopy.   In point of fact, Tom Peters, an Ausin Mohawk employee, sent an email to Monique Whitely at Meltech on August 25, 2009 where he stated:

> Good morning Monique.   I need the forms so I can submit my subcontractors for approval to work on the Patuxent River site.   We will be installing a canopy.

*See* Tom Peters email, attached hereto as Exhibit 13.

As Exhibit 13 clearly shows, an official at Austin Mohawk, a few days prior to the accident, represented to Plaintiff that it and its subcontractor, which was Beechgrove under the contracts, would be "installing a canopy."

Significantly, neither Austin Mohawk nor Beechgrove ever advised Plaintiff that it intended to transfer its contractual duties and potential liabilities under the subcontracts to White. Moreover, Austin Mohawk and Beechgrove recognized that they could be liable to a purchaser of a canopy, by virtue of the fact that when they contracted with White, they required White to indemnify them for any damages caused by improper installation of the beam.[5]

**Who Is Defendant White?**

White was an Indiana sole proprietorship that Beechgrove improperly retained to erect the canopy at issue.   Importantly, White should never have been on the job site because of its record, which had not been properly vetted by Defendants Austin Mohawk and Beechgrove. Robert White, the sole owner of the White construction business, only possessed a ninth-grade

---

[5] This is in stark contrast to requiring White to pay Plaintiff directly for damages, and it contemplates that Austin Mohawk/Beechgrove would know that they could be liable under the subcontract to Plaintiff for White's wrongdoing.   The subcontract between White and Beechgrove was never provided to Plaintiff prior to White installing the beam.

education, and one of the technical knowledge necessary for installing a canopy.  *See* White

Depo at 10-11, attached hereto as Exhibit 14.   White had no licenses other than driver's

licenses.[6]  *See* White Depo at 29-30, attached hereto as Exhibit 16.  Notably, White is not insured

by Austin Mohawk or Beechgrove, and no certificate of insurance for White was provided prior

to installation of the canopy.

### Defendant White Consciously Ignored All Applicable Standards

According to White, his employees largely did not possess licenses or certification.  *See*

White Depo. at 48, attached hereto as Exhibit 17.   White had also been cited by OSHA in the

past for violations, *see* White Depo at 63, 65, attached hereto as Exhibit 18, and actively looked

with disdain on the OSHA standards that it tried to circumvent (Mr. White referred to OSHA as a

"joke").  *See* White Depo at 67, 79, 119-120 attached hereto as Exhibit 19.

White had no internal rules or policies and procedures to guide its work.  *See* White Depo

at 36, 56, attached hereto as Exhibit 20.  White testified that he did *not* routinely inspect the

equipment he used, including the kinds of slings that caused the accident at issue,  *see* White

Depo at 54, 75, attached hereto as Exhibit 21, and he did not train his employees in key things

like fall protection, rigging inspection and general safety training.  *See* White Depo at 60-61,

attached hereto as Exhibit 22.

### Beechgrove Directly Oversaw White And Instructed It On What Kind Of Equipment To Use

White did state, however, that Beechgrove asked him to comply with Beechgrove's

safety standards and policies, but that Beechgrove never provided him an actual copy of its

policies and safety standards.  *See* White Depo at 68, attached hereto as Exhibit 23.  Beechgrove

---

[6] Mr. White only received his license a few years before the accident occurred.  His license was revoked for reckless driving and other run-ins with the law prior to that.  *See* White Depo at 29-30, attached hereto as Exhibit 15.

acknowledged that it required its installers to review and sign its policies; however, no such signed policies for White exists. White further testified that Beechgrove would come out to job sites and instruct him on what kind of equipment to use. *See* White Depo at 69, attached hereto as Exhibit 24. Mr. White stated that Tom Peters told him he had to use a forklift for the job that caused the accident. *See* White Depo at 179, attached hereto as Exhibit 25. Defendant Austin Mohawk even provided details to White about the kind of sling they were supposed to use to do the lift. *See* Sling Details, attached hereto as Exhibit 26. This is important because OSHA found, and it is undisputed, that the sling played a critical role in the accident. *See* Ex. 33 *infra*.

On August 31, 2009, the day of the accident, White was in contact with representatives from Beechgrove. *See* White Depo at 95, attached hereto as Exhibit 27. White testified that he did not like dealing with the Defendants and had significant issues with the representatives from Austin Mohawk and Beechgrove, including Tim Teeter, who Mr. White stated "tried to push it, do whatever it took to get the job done, whether it was right or not." *See* White Depo at 172, attached hereto as Exhibit 28.

Unfortunately, the Defendants' cavalier attitude toward safety, training, and equipment caused Mr. Halferty's death. If Defendant Beechgrove had adequately checked on Defendant White's background and business practices, it never should have hired White to install the canopy in the first place.

### The Night Of The Accident

On the night of August 31, 2009, Defendants Austin Mohawk, Beechgrove and White were working on the construction of the canopy at Pax River, Gate 1. At or around 9:50 p.m., White was executing the lift using a lull, forklift, and other equipment approved by Defendants Austin Mohawk and Beechgrove. *See* Exs. 24, 26. White was also using the sling that he was

directed to use by Austin Mohawk.  *Id.*  These facts are key because OSHA (and the expert witnesses in this case), have determined that the equipment was critical to causing the accident. *See* Exs. 31, 33.  Indeed, White used the equipment to lift a 72' long steel beam into place. White threaded a synthetic sling as part of their rigging process around the beam to complete the lift and installation.  The beam was not secured in the sling in conformance with industry standards.  As a result, the sling failed when the beam was raised. The beam fell, struck, and killed Ronald Halferty, an employee of White.  Mr. White testified during his deposition that he was the last person who could have prevented the accident, stating:

Q   Okay.  Who do you think was the last person

who could have prevented the accident?

A   Me.

*See* White Depo at 123, attached hereto as Exhibit 29.

Mr. White recognized that he was the last person who could have prevented the accident because he, working with Austin Mohawk and Beechgrove, was responsible for the equipment that resulted in the accident at issue.  Indeed, expert Chuck Eroh stated as much in his deposition:

> Because the responsibility for – the strap broke.  The responsibility for the inspection of the strap was with White Construction, Austin Mohawk and Beechgrove.
> …
> Meltech hired Austin Mohawk and Beechgrove, who subcontracted the work to White Construction to erect.  They had the responsibility to do it correctly and to do it safely.  That's part of their work scope.  That's what you hire them to do.

*See* Depo of Chuck Eroh at 114, 124, attached hereto as Exhibit 30.

Notably, not one of the three construction experts designated to testify in this case has opined that Robert White complied with industry standards of care when lifting the steel beam.

*See* Three Expert Reports attached as Exhibit 31 (Terry Lane, the expert for Austin Mohawk and Beechgrove, for instance, wrote on page 1 of his report, "I agree with the findings in the OSHA investigation and Report regarding the responsibility of Robert White and his failure to comply with applicable OSHA regulations.")  It is thus undisputed that White breached the standards of care.

### Aftermath Of The Accident

As a result of the injury to Mr. Halferty, Plaintiff suffered material damage.  That is, as a result of these events, a *stop work order* was issued for the site, (*see* Ex. 32), and an OSHA investigation was initiated.  The job was delayed for months and Plaintiff was precluded from working at night (which is when the work was supposed to have been done).  Instead, it was forced to work on the weekends and during the day which significantly impacted Plaintiff and the job.  The work stretched from the fall through one of the worst winters in the history of the D.C. Metropolitan region.  Plaintiff was forced to incur significant expenses related to the delay, including additional equipment rental expenses, and expenses related to staffing, materials, scope of work changes, and paperwork.  In addition to these damages, there was damage to property, including damage to a sentry house, damage to certain pieces of construction equipment, and damage to the beam that fell, which had to be reinspected, reprimed, and recertified.

### The OSHA Investigation

On September 21, 2009, as part of the aforementioned OSHA investigation, OSHA cited White for serious violations, including the fact that White had improperly utilized the sling that ultimately failed.  *See* OSHA Findings, attached hereto as Exhibit 33.  OSHA specifically found that as to Defendant White and the equipment it used on the job site:

20.    Instance Description – Describe the following:

11

There was obvious existing and new damage to the synthetic sling as observed by the CSHO. CSHO learned from the employee operating a tag line for the beam that when the beam reached near the top of the column it began to sway left and right. This sway would have caused the eyes of the sling to work back and forth on the edge of the fork truck tine, which caused the eyes to tear/rip. There were cutes in the eye of the sling, in the same location that the break occurred on the other eye. This would have increased the risk of sling failure.

*See* Exhibit 33 at 2.

Further, OSHA ascertained

23.    Employer Knowledge:  the owner of the company (White) was acting as crew leader and owned all the slings that were located on his truck. The owner told a laborer to fetch a sling from the truck and use it to rig the steel beam. The owner was operating the fork truck that was used to lift the beam into place.

24.    Comments (Employer, Employee, Closing Conference):  The owner stated that he had never used padding or a softener for slings.

…

It is industry practice to install padding/softeners on sharp edges for materials that is going to be lifted by slings.

*See id.*

Thus, OSHA found that Defendant White was guilty of <u>serious violations</u> on the job site because it had not acted appropriately and in conformance with industry standards, specifically in regard to the use of padding for the lift.[7]  During the OSHA evaluation, Charles Rossi was present during OSHA's interview with Mr. White and testified to the following:

Were you present when OSHA interviewed Bob White?

Yes.

What did Bob White say?

He didn't really say that much.  He was sitting in his chair to my left, and he kept saying:

───────────────

[7] *See* White Deposition Testimony at 75, attached hereto as Exhibit 34.

> Oh my God, it's my fault.  Oh my God, it's my fault.  He just continued to
> say oh, my God, it's my fault.  I believe he said one time I killed my
> brother-in-law, and the OSHA guy tried to bring him around to answer the
> questions so he could get to the root of the issues, and he finally calmed
> down a little bit.  I don't remember the exact questions from OSHA.

*See* Depo of Charles Rossi at 164, attached hereto as Exhibit 35.

Plaintiff was fully cleared by OSHA of any wrongdoing related to Mr. Halferty.  Defendants

Austin Mohawk and Beechgrove were not cited because they were not present during the

investigation.  *See* Depo of Chuck Eroh at 152, attached hereto as Exhibit 36 (Austin Mohawk

and Beechgrove were not on site and therefore were not part of OSHA's evaluation).

### Plaintiff Suffers Significant Damages Because Of The Accident

As a result of the accident and attendant investigation by OSHA, the aforementioned stop

work order was issued by NAVFAC.  The job was significantly delayed and Plaintiff suffered

hundreds of thousands of dollars in direct damages, as well as millions of dollars in damages for

lost profits and lost contracts. *See* Report of Neil Demchick attached as Exhibit 37.

### IV.    LEGAL STANDARD

Summary judgment is only appropriate when the matters presented to the court "show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The burden is on the moving party to demonstrate the absence of any genuine dispute of material

fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  If sufficient evidence exists for a

reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine

dispute of material fact is presented and summary judgment should be denied. *Anderson, supra,*

*All* U.S. 242, 248.

In ruling on a motion for summary judgment, a court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).   The party moving for summary judgment always bears the burden of establishing that no genuine issue of material fact exists.  *See Celotex Corp.*, 477 U.S. at 322.  In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the opponent of the motion, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.s. 464, 473 (1962), and doubts resolved in favor of the opponent.  *Cantor, dba Selden Drugs Co. v. Detroit Edison Co.*, 428 U.S. 579, 582 (1976).

## V.   MATERIAL FACTS NOT IN DISPUTE

As it pertains to Plaintiff's Motion for Partial Summary Judgment (and Defendants' Motion for Summary Judgment), the following facts are not in dispute:

- Defendant Austin Mohawk misrepresented to Plaintiff that Beechgrove would install the canopy.  *See* Exs. 4, 9-10, 13.   Instead, Third-Party Defendant Robert White installed the canopy;

- Defendants did not identify any sub-subcontractors 14 days before installation of the canopy as required by the contract;

- Third-Party Defendant Robert White breached industry standards and the terms of the Beechgrove contract with Plaiintiff by failing to install the beam as per the terms of the contract.  *See* Exs. 14, 23, 29, 33;

- Defendant White was the last person who could have prevented the accident. Ex. 29;

- Defendants Austin Mohawk and Beechgrove drafted the lift plan that directed Defendant White how to do the lift that resulted in the accident at issue. Ex. 45;

- Defendants Austin Mohawk and Beechgrove told Defendant White what kind of equipment to use to do the job that resulted in the accident at issue.  Exs. 24-26;

- Defendant Beechgrove did not provide a copy of its Safety Policy to Defendant White.  Ex. 23;

- Defendant White had no licenses other than a driver's license.  Ex. 15, 17;

- Defendant White had prior OSHA violations.  Ex. 18;

- Defendant White chose not to use padding on the sling that caused the accident at issue.  Ex. 34;

- OSHA cited Defendant White for serious violations, including the failure to use padding on the sling that caused the accident.  Ex. 33; and

- OSHA did not cite Plaintiff for any violations.  Ex. 33;

- A stop work order was issued by the Government because of the accident that delayed the job; Ex. 32;

- Plaintiff suffered direct damages that it was responsible to pay as a result of the accident and the attendant stop work order.  Ex. 37.

The undisputed facts set forth above not only support Plaintiff's Motion for Summary Judgment, they also demonstrate why Defendants' Motion for Summary Judgment should be denied.

## VI.    MATERIAL FACTS IN DISPUTE

The following disputed material facts preclude the entry of summary judgment in favor of Defendants Austin Mohawk and Beechgrove:

- There is a genuine issue of material fact in dispute concerning whether Defendants Austin Mohawk and Beechgrove properly identified any subcontractors. Defendants submit that they did, but the evidence demonstrates otherwise. Exs. 9-10, 13;

- There is a genuine issue of material fact in dispute concerning whether Defendants Austin Mohawk and Beechgrove complied with their own internal safety rules and policies and procedures. Defendants submit that they did, but the evidence demonstrates otherwise. Exs. 23-28, 33;

- There is a genuine issue of material fact concerning whether Defendants Austin Mohawk and Beechgrove controlled Defendant White. Defendants submit that they did not, but the evidence demonstrates otherwise. Exs. 24-28.

## VII.   ARGUMENT

### A.   Summary Judgment Should Be Entered In Favor Of Plaintiff On Its Claims Against The Defendants

While partial summary judgment should be entered in favor of the Plaintiff as to all of its claims, at the outset, it is important to recognize that the record is clear that Defendant White breached a number of industry standards. *See* Exs. 31, 33. These breaches caused the accident that is at issue here. Mr. White, the owner of Defendant White, even admits as much. *See* Ex. 29. This is key for purposes of Austin Mohawk's and Beechgrove's liability because both Defendants are responsible for White's actions.

#### 1.   Partial Summary Judgment Should Be Entered Against Defendant White In Favor Of Plaintiff Since It Is Undisputed That White Breached Industry Standards

Plaintiff has asserted claims for Breach of Contract, Negligence, Contractual Indemnity, and Negligent Misrepresentation. The lynchpin of each of these claims against Austin Mohawk

16

and Beechgrove is the failure of Defendants and White to properly install the beam as required by the contract and industry standards.

The undisputed facts reveal the following about Defendant White's breach of various industry standards:

- Defendant White chose not to follow industry standards.  Exs. 18-22, 29, 33-34;

- Defendant White chose not to follow OSHA standards.  Ex. 19;

- Defendant White believed OSHA standards were a "joke."  Ex. 19;

- Defendant White chose not to properly pad the lull that was used during the lift.  Ex. 34;

- Defendant White testified he was the last person who could have prevented the accident. Ex. 29;

- Defendant White was specifically cited by OSHA for serious violations in regard to the accident at issue in this case, Ex. 33, and Defendants' expert agrees that Defendant White failed to comply with the applicable OSHA regulations.  Ex. 31.

Accordingly, the undisputed facts show that Defendant White breached a number of industry standards.  These breaches led to the accident that is at issue in this case.  Summary judgment should therefore be entered in Plaintiff's favor as to the issue of Third Party Defendant White breaching numerous industry standards.

### 2. Summary Judgment Should Be Entered In Favor Of Plaintiff As To The Issue Of The Canopy Being Properly Installed

Under the terms of its contract with Meltech, Beechgrove was to install the canopy at issue.  *See* Article 3 of the Contract, Ex. 10.  The installation was supposed to be done properly and in a workmanlike manner and in conformance with industry standards.  We now know that Beechgrove subcontracted with Third Party Defendant White and that White did not install the canopy properly.  Indeed, the undisputed evidence demonstrates that White breached myriad

guidelines and industry standards when it failed to properly install the canopy and caused the accident at issue.   *See* Exs. 29, 30-31, 33-34.   Even Defendant Austin Mohawk's and Beechgrove's own liability expert, Terry Lane, agrees that Defendant White breached the applicable regulations.   *See* Exhibit 31 (the Report of Terry Lane at 1.)   The reason why?   The material undisputed facts demonstrate that the Defendants did not properly install the canopy.[8] Plaintiff is therefore entitled to summary judgment on this point.

> **3.   Summary Judgment Should Be Entered Against Beechgrove In Favor Of Plaintiff On Its Claim For Breach Of Contract Since Beechgrove Had A Duty To Install The Canopy In Conformance With Industry Standards**

As noted above, under the terms of its contract with Plaintiff, Beechgrove was to install the canopy at issue.   *See* Article 3 of the Contract, Ex. 10.[9]   The installation was supposed to be done properly and in a workmanlike manner and in conformance with industry standards.   The undisputed facts clearly show that Beechgrove breached its contract with Plaintiff because it did not properly install the canopy.   Rather, Beechgrove attempted to hand off the responsibility to Defendant White, who Defendant Beechgrove's own expert witness determined did not comply with industry standards, Ex. 31, and caused the accident at issue.   Because the facts are undisputed, Plaintiff should be entitled to summary judgment on its breach of contract claim and Defendants' Motion for Summary Judgment pertaining to their Austin Mohawk's contractual obligations to Plaintiff (see Defs' Mot. for Summ. Judgment at 5-6), should be denied

---

[8] In addition, since Mr. White has already testified under oath that he was the last person who could have prevented the accident, Ex. 29, contributory negligence is not an issue or a proper defense to Plaintiff's claims.

[9] In addition, Exhibit L to Defendants' Motion for Summary Judgment, the email from Tom Peters to Monique Whitely at Plaintiff, clearly shows that Austin Mohawk was representing that it and its subcontractor under the contract, Beechgrove, were installing the canopy.

In addition to the above, "Maryland courts apply the objective theory of contract interpretation in which an unambiguous contract must be given the effect of its plain meaning in the context in which it was employed and without regard to the parties' subjective intent at the time of formation." *County Com'rs of Charles Cnty, Md. v. Panda-Brandywine, L.P.*, 663 F. Supp. 2d 424, 428 (D. Md. 2009), *aff'd* 401 F. App'x 831 (4th Cir. 2010). To construe a contract, the Court must "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). "[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." *Id.* That is, "[a] court will presume that the parties meant what they stated in an unambiguous contract, without regard to what the parties to the contract personally thought it meant or intended it to mean." *Maslow v. Vanguri*, 168 Md. App. 298, 318 (2006); *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 341 (1999) ("[T]he clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean."). The plain language of the contracts at issue unequivocally states that Beechgrove was responsible for installing the canopy.

The subcontract between Plaintiff and Beechgrove state, in pertinent part, "Subcontractor [Beechgrove] agrees to commence Subcontractor's work herein described upon notification by Contractor, and to perform and complete such work of Contractor in accordance with Contractor's schedule. This shall include all work necessary or incidental to complete the **Single Bottom Flat Deck Canopy/ Austin Mohawk and Company, Inc. Quote #62354, dated 1-27-09.**" (Ex. 10, Subcontract between Meltech and Beechgrove, Article 2) (emphasis in the original.) Quote #62354, provided by Austin Mohawk to Meltech, unequivocally affirm

"Beechgrove to install." (Ex. 38, Canopy Quotation, at 1.)  Likewise, the subcontract between

Plaintiff and Austin Mohawk specifies: "offload and install by Beechgrove Construction Inc."

(Ex. 9, Meltech & Austin Mohawk Subcontract, Article 2.)  The subcontracts are unanimous:

ultimately, Beechgrove had the duty to install the canopy (further, Exhibit 4, the testimony of

John Millet, specifically supports that Beechgrove was to do the installation).

 Nowhere in any of the contracts does Plaintiff permit Beechgrove to subcontract its

obligation to install the canopy to White or any other subcontractor.  To the contrary, the plain

language of all the contracts consistently states that Beechgrove (and Beechgrove alone) was to

install the canopy.  The Court must give effect to the contracts as they were written, divorced

from the subjective interpretation that Beechgrove and Austin Mohawk have now manufactured

*post hoc* in an improper attempt to overcome the plain and unambiguous terms of the contracts.

Simply put, wishful thinking on the part of Austin Mohawk and Beechgrove that the contracts, as

written, permit Beechgrove to subcontract its duties does not make it so.

 The above notwithstanding, Beechgrove nevertheless argues that it can escape liability as

a matter of law because it transferred its duties under the contract to Robert White by virtue of its

contract with Robert White.  Beechgrove is wrong.  There is no evidence of an expressed intent

by any party that Beechgrove could transfer its duty under the contract.

**Beechgrove Also Breached Its Contract Because It Did Not Properly Notify Plaintiff That It Would Be Using A Subcontractor Within The Time Period Set Forth In The Subcontract**

 In line with the above, to the extent Beechgrove wanted to use additional subcontractors,

under paragraph 13 of page 5 of 5 of the subcontract (Ex. 10), it was required to identity any

additional subcontractors two weeks before the scheduled canopy installation.  It never did this.

The email(s) that Defendants rely on in various portions of their Motion, including their Exhibit

L, is of no moment because it fails to identify Robert White Construction as the party who would

actually install the canopy. The simple fact is, Defendants never identified Defendant White as a subcontractor two weeks before installation as required by the contract.[10]

The reason Defendants' statements about who would do the installation are important is because Plaintiff contracted with Defendants specifically because they held themselves out as experts and specifically represented to Plaintiff that one contract for delivery and one contract for installation should be executed. Defendants represented they were the industry leaders and would be doing the installation. Plaintiff would not have contracted with Defendants if it had known that someone like Defendant White would be doing the installation. Indeed, Stephan Krishack testified that:

> But it was always our understanding from in communications with Beechgrove and Austin, that Austin would manufacture the product and their subsidiary Beechgrove would install it. And if they used any subcontractors, they would be – they would be incidental subcontractors to support that work, if any.

See Depo of Stephan Krishack at 91, attached hereto as Exhibit 39.

Mr. Krishack further testified that:

> The first time that we became aware that there was an R. White subcontractor was after the fatality.

See Depo of Stephan Krishack at 93, attached hereto as Exhibit 40.

Mr. Krishack specifically testified that he hired Austin Mohawk and Beechgrove to further the canopy and install it:

> Q:   What did you talk about in that regard with regard to business practices with regard to hiring of work crews?
>
> MR. BRODSKY: Objection to form.

---

[10] Further, the "Canopy Quotation" exchanged between Plaintiff and Austin Mohawk in early-2009, also represents that Beechgrove will install the canopy. The Quotation states "Beechgrove Construction Inc.: Installation Invoice Submitted at time of field installation." See Canopy Quotation, attached hereto as Exhibit 38.

A:      We did not talk about hiring of work crews.  I was – my point of view at the time that Austin Mohawk was our company.  That was it.

…

Q:      It was your understanding that Beechgrove would handle the actual installation and construction of the canopy?

A:      Yes.

…

A:      From the very beginning, Austin Mohawk indicated to use directly that Beechgrove Construction would be doing the installation.

Q:      Did anyone specifically tell you that Beechgrove would not be using subcontractors?

A:      Using a third-tier subcontractor to install this canopy was never discussed by me at Meltech with anybody at Austin or Beechgrove.

Q:      It was never discussed at all?

A:      Never discussed.

…

A:      We agreed to those terms.  But it was always our understanding from in communications with Beechgrove and Austin, that Austin would manufacture the product and their subsidiary Beechgrove would install it.  And if they used any subcontractors, they would be – they would be incidental subcontractors to support that work, if any.

…

All I can say is when the project started and the lifting was to be done, we thought it was Austin Mohawk working with Beechgrove.  Beechgrove was checked out by me like I did Meltech – excuse me – I mean, like I did Austin Mohawk.  I had no chance to check for this other gentleman that came in and installed it.

*See* Depo of Stephan Krishack at 55, 68, 74, 91, 153, attached hereto as Exhibit 41.

Defendants assert on page 9 of their Motion, without citing to any evidence, that the "evidence demonstrates that Meltech actually knew that Beechgrove was using a subcontractor."

Not true.  The overwhelming evidence, including the testimony cited above, shows that Plaintiff believed that Beechgrove would be responsible for the erection of the canopy.  When Beechgrove failed to properly install the canopy, it breached its contract with the Plaintiff. Because the facts are undisputed, Plaintiff should be entitled to summary judgment on its breach of contract claim and Defendants' Motion for Summary Judgment pertaining to Beechgrove's contractual obligations to Plaintiff (*see* Defs' Mot. for Summ. Judgment at 9-11), should be denied.

4. **Summary Judgment Should Be Entered In Plaintiff's Favor As To Its Negligence Claim Against Defendants Austin Mohawk And Beechgrove Since Both Are Liable For Failing To Properly Oversee The Installation Of The Canopy**

Austin Mohawk and Beechgrove had their own rules and policies and procedures that made them responsible for the canopy installation and the actions of Defendant White.  For instance, Austin Mohawk promulgated its own "Guidelines For Cranes, Hosts & Rigging Safety."  *See* Guidelines, attached hereto as Exhibit 42.

These Guidelines state:

**Supervisors are responsible for:**

- Ensuring that employees under their supervision receive the required training and are certified and licensed to operate the cranes and hoists in their areas.

*See* Exhibit 42 at 1.

There is no evidence Austin Mohawk ensured that Defendant White had the requisite background or licensure to do the lift that caused the accident at issue.

The Guidelines also state:

E)   **General Safety Rules**

Operators shall comply with the following rules while operating cranes and hoists:

- Do not engage in any practice that will divert your attention while operating the crane.

- Do not move a load over people.

- Avoid side pulls and/or load swinging.

*See* Exhibit 42 at 3.

Again, there is no evidence that Austin Mohawk enforced its own safety requirements as to Defendant White.

Further, the Guidelines detail, at length, various requirements concerning rigging and safety, including that:

### G.    General Rigging Safety Requirements

Use only select rigging equipment that is in good condition.   All rigging equipment shall be inspected at least annually.   Defective equipment shall be removed from service and destroyed to prevent inadvertent use.

*See* Exhibit 42 at 5.

There are numerous other pages in Exhibit 42 which detail other guidelines and safety rules that must be followed.  There is no evidence Austin Mohawk abided by or enforced its own safety rules and policies and procedures even though it had an obligation to in regard to the canopy installation.  This clearly represents negligence on the part of Defendant Austin Mohawk.

### Beechgrove's Safety Policies

Beechgrove also had its own Safety Policy that set forth a number of strictures that had to be followed.  *See* Beechgrove's Safety Policy, attached as Exhibit 43.  Mr. Millet testified at deposition that Beechgrove has "oversight responsibility for the subcontractors it selects," and that one of the ways it oversees its subcontractors is via its safety policies. *See* Millet deposition

at 36-37, attached hereto as Exhibit 44.  In line with that, Exhibit 43 details that Beechgrove's

Safety Policy is:

> [P]rovided to familiarize all sub-contractors with Beechgrove Construction safety rules, procedures and guidelines for preventing jobsite accidents and injuries.  As a subcontractor to Beechgrove Construction it is your responsibility to comply with the following site specific safety rules, procedures and OSHA guidelines as well as all applicable Federal, State & Local Regulations.

*See* Exhibit 43 at 1.

There is no evidence Beechgrove provided its Safety Policies to Defendant White or made any

effort to see that he complied with them, even though the plain language of the Safety Policies—

and the testimony of Mr. Millet—demonstrate that it should have.   White even stated that

Beechgrove asked him to comply with Beechgrove's safety standards and policies, but that

Beechgrove never provided him an actual copy of its policies and safety standards.  *See* White

Depo at 68, attached hereto as Exhibit 23.  Beechgrove clearly was negligent in failing to ensure

that Defendant White followed its policies and procedures.  Because the facts are undisputed,

Plaintiff should be entitled to summary judgment on its negligence claim against Austin Mohawk

and Beechgrove, and Defendants' Motion for Summary Judgment relating to the issue of their

negligence (see Defs' Mot. for Summ. Judgment at 7-8, 13-15), should be denied.

> **5. In The Alternative, Summary Judgment Should Be Entered In Plaintiff's Favor As To Its Negligence Claim Against Defendants Austin Mohawk And Beechgrove Since Both Are Vicariously Liable For Defendant White's Actions**

The material undisputed facts demonstrate that White's violation of myriad industry

standards directly caused the accident that harmed the Plaintiff.  OSHA determined as much after

investigating the accident and even Mr. White testified at length that he violated industry

standards, chose not to follow industry standards, and was the last person who could have

prevented the accident.  That said, Austin Mohawk and Beechgrove are directly responsible for

Mr. White's actions because they maintained authority and control over him.  As set forth in greater detail below, Austin Mohawk and Beechgrove instructed Mr. White how to do the lift that caused the accident and what kind of equipment to use.  Further, Austin Mohawk and Beechgrove each had their own internal policies and procedures through which they supervised and controlled Defendant White while on site.

### Beechgrove Exerted Control Over White

The general rule in Maryland is that an employer is not liable for an employee or contractor who pursues "independent employment, and, by the terms of the contract, is free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about his work, exclusive of the control and direction … of the party for whom the work is being done." *Appiah v. Hall*, 416 Md. 533, 554, 7 A.3d 536, 563 (2010).  On the other hand, "[w]hen an employer has retained control of the details of the work, however, liability is permitted under a theory of actual fault." *Id.*  General control over an ostensibly independent contractor is usually insufficient to establish liability as an employer must have retained at least "some degree of control over the manner in which the work is done." *Id.*  The undisputed facts and testimony clearly show that Defendants Austin Mohawk and Beechgrove retained direct control over the manner in which Defendant White did the work at issue.

### Beechgrove Developed The Lift Plan

To begin with, Mr. Millet testified that "Beechgrove Construction developed the lift plan, which involves the order in which the materials are to be installed." *See* Millet Depo at 104, attached hereto as Exhibit 45.  Mr. Millet also recognized and testified that the lift plan was important because it is "the way these things have to be put up, you have to put the vertical columns in place first, you have to put the cross beams up second, and you have to put the

26

purlins third." *See* Millet Depo at 102, attached hereto as Exhibit 46.   Thus, Beechgrove developed the very plan that White utilized which caused the accident that gave rise to this case.

### Austin & Beechgrove Told White What Kind Of Equipment To use

Not only did Beechgrove develop the lift plan that gave rise to this case, it also directly oversaw White and instructed it on what kind of equipment to use. *See* Exs. 24-26.   As noted before, Mr. White testified that Beechgrove would come out to job sites and instruct him on what kind of equipment to use. *See* White Depo at 69, attached hereto as Exhibit 24.   Mr. White also stated that Tom Peters at Austin Mohawk told him he had to use a forklift for the job that caused the accident. *See* White Depo at 179, attached hereto as Exhibit 25.   Accordingly, the testimony from Mr. Millet and Mr. White reflects the following:

- Beechgrove developed the lift plan at issue;
- Beechgrove instructed White on what kind of equipment to use on the job;
- White implemented the lift plan;
- White utilized the equipment mandated by Beechgrove;
- The use of the lift plan and the aforementioned equipment led to the accident at issue.

Under the applicable case law, Beechgrove maintained direct control over White because it retained control over the details of the work.   In point of fact, Beechgrove retained significant control over the manner in which the work was done, specifically because it developed the lift plan—which mandated how the lift was to proceed—and told White what kind of equipment to use.   There can be no greater demonstration of retention of control than one company telling another company how to do its job and what equipment to use to do it.   Simply put, the undisputed facts show Defendants Austin Mohawk and Beechgrove dictated to White the means and equipment he was to use to do the job.   When such control has been retained by parties in the

27

position of Austin Mohawk and Beechgrove, liability can clearly attach for the actions of White. *See Appiah*, *supra* at 563, 7 A.3d at 554 (when "an employer has retained control of the details of the work, however, liability is permitted under a theory of actual fault."). The undisputed facts clearly show that Beechgrove retained control over White and is responsible for its action. As such, summary judgment should be entered in Plaintiff's favor.

### Austin Mohawk And Beechgrove Had Authority Over White Vis-à-Vis Their Own Internal Rules And Policies

#### Austin Mohawk

As noted above, Austin Mohawk and Beechgrove had their own rules and policies and procedures that allowed them to exercise control over Defendant White. *See* Exs. 42-43. Exhibit 40 demonstrates that Austin Mohawk expected those working with it to abide by a whole host of strictures and safety rules, including making sure workers and subcontractors had the proper licensure. There is no evidence Austin Mohawk ensured that Defendant White had the requisite background or licensure to do the lift that caused the accident at issue. There is also no evidence that Austin Mohawk enforced its own safety requirements as to Defendant White, or abided by its own safety rules and policies and procedures even though it had an obligation to.

#### Beechgrove

As with Austin Mohawk, Beechgrove had its own Safety Policy that set forth a number of strictures that had to be followed. *See* Exhibit 43. There is no evidence Beechgrove provided its Safety Policies to Defendant White or made any effort to see that he complied with them, even though the plain language of the Safety Policies says that Beechgrove will. *See* Ex. 23. Indeed, on page 3 of Exhibit 43 there is a signature line for subcontractors to sign to demonstrate that they will act in compliance with Beechgrove's safety policies. Beechgrove failed to get

Defendant White to sign Exhibit 43 and breached its obligations to Plaintiff by failing to ensure

that Defendant White would follow the safety policies and act appropriately on the job site.

> 6. **Summary Judgment Should Be Entered Against Austin Mohawk In Favor Of Plaintiff On Its Claim For Negligent Misrepresentation Since The Undisputed Facts Show Austin Mohawk Negligently Misrepresented Who Would Be Installing The Canopy**

The subcontracts with Austin Mohawk and Beechgrove demonstrate that both Defendants

negligently misrepresented White's status on the job.   Page 1 of the Austin Mohawk subcontract

states that Beechgrove will be installing the canopy.  *See* Exhibit 9.[11]  Page 5 of 5 of the

Beechgrove subcontract lists Beechgrove as the subcontractor.  *See* Exhibit 10.  Austin Mohawk

misrepresented this fact since Beechgrove ultimately did not install the canopy.  The statement

that Beechgrove was going to install the canopy was false, was made to induce Meltech to enter

into the contract (by misleading Plaintiff into believing that Beechgrove was an expert and would

be doing the installation), and Plaintiff—as testified to by Stephan Krishack--justifiably relied on

Austin Mohawk's misrepresentations.  Plaiintiff was accordingly damaged when an incompetent,

third-tier subcontractor, Defendant White, failed to properly do its job.  Because the facts are

undisputed, Plaintiff should be entitled to summary judgment on its negligent misrepresentation

claims against Austin Mohawk and Beechgrove, and Defendants' Motion for Summary

Judgment relating to the issue of their negligent misrepresentations (see Defs' Mot. for Summ.

Judgment at 6-7, 11-13), should be denied.

> 7. **Summary Judgment Should Be Entered Against Austin Mohawk And Beechgrove As To Certain Losses And Expenses Incurred By Plaintiff, Including Losses That Must Be Indemnified**

It is undisputed that the accident caused by Defendants' negligence and other acts

---

[11] In addition, James McTernan, from Plaintiff (who was on the job the night of the accident), testified that neither Austin Mohawk nor Beechgrove ever mentioned that they would be using subcontractors on the job. *See* Depo of James McTernan at 116, attached hereto as Exhibit 47.

significantly impacted Plaintiff.   As detailed in Plaintiff's Amended Complaint, property was damaged because of the accident caused by, among other acts, Defendants' negligence.   Under the indemnification provisions in the contracts, including the contract between Plaintiff and Defendant Austin Mohawk, Austin Mohawk agrees to indemnify Plaintiff for:

> [A]ll damages, losses, or expenses, including attorney fees from any claims or damages for bodily injury, sickness, disease or death, or from claims for damages to tangible property, other than the work itself.  This indemnification shall extend to claims resulting from performances of this Subcontract and shall apply only to the extent that the claim or loss is caused in part or whole by any negligent act or omission of Subcontractor or any of its agents, employee(s) or Subcontractors.

*See* Exhibit 9 at page 2.

Beechgrove's contract with Plaintiff has the very same language.  *See* Exhibit 10.

The undisputed facts show that the Defendants were negligent in attempting to erect the canopy, their negligence caused various injuries to the Plaintiff, including damage to property other than the work itself, and that under the plain language of the contracts, Plaintiff is entitled to indemnification in an amount to be proved and determined at trial.  Because the facts are undisputed, Plaintiff should be entitled to summary judgment on its claim for indemnification against Austin Mohawk and Beechgrove, and Defendants' Motion for Summary Judgment relating to the issue (see Defs' Mot. for Summ. Judgment at 15-16), should be denied.

### 8.   Summary Judgment Should Be Entered Against Austin Mohawk And Beechgrove As To The Issue Of Direct And Other Damages

Defendants seek summary judgment, while citing to only one case which actually supports Plaintiff, on Plaintiff's claim for future damages arising from the death of Mr. Halferty. In short, while Defendants' claim that Plaintiff's lost profits claim is speculative, their motion ignores the applicable law and omits critical testimony demonstrating a material issue of fact.

**The Applicable Law Supports Plaintiff's Claims For Lost Profits And Demonstrates Material Facts Are In Dispute Which Preclude Summary Judgment Being Entered In Defendants' Favor**

Under Maryland law, Plaintiff may recover lost profits arising from Defendant's wrongdoing if it can (i) establish that breach by the defendant caused the loss; (ii) show that when the contract was executed, the defendant could have "reasonably foreseen that a loss of profits would be a probable result of a breach;" and (iii) prove lost profits with certainty. *M & R Contractors & Builders, Inc. v. Michael*, 215 Md. 340, 345-46, 138 A.2d 350, 353 (1958). In *Evergreen Amusement Corp. v. Milstead*, while rejecting a drive-in movie theater's attempt to recover for lost profits arising from a contractor's delay, the Court of Appeals recognized that established businesses may recover for loss of profits in a breach of contract action:

> Under the great weight of authority, the general rule clearly is that loss of profit is a definite element of damages in an action for breach of contract or in an action for harming an established business which has been operating for a sufficient length of time to afford a basis for estimation with some degree of certainty as to the probable loss of profits, but that, on the other hand, loss of profits from a business which has not gone into operation may not be recovered because they are merely speculative and incapable of being ascertained with the requisite degree of certainty.

206 Md. 610, 618, 112 A.2d 901, 904 (1955). Citing Restatement (Contracts) § 331 with approval, the Court stated that lost profits may reasonably be predicted based on the past history of an established business. *Id.*, 112 A.2d at 904; *see also John D. Copanos & Sons, Inc. v. McDage Rigging & Steel Erection, Co., Inc.*, 43 Md. App. 204, 208, 403 A.2d 402, 405 (1979) ("The real concern in considering lost profits as an element of damages is not whether the business is old or new, but rather whether anticipated profits can be shown with reasonable certainty so that the evidence rises above speculation or conjecture.").

Maryland cases have clarified that a plaintiff need only establish loss profits with "reasonable certainty." *M & R Contractors*, 215 Md. at 348-49, 138 A.2d at 355 ("[R]ecovery

may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty."). The reasonable certainty requirement is not a harsh or exact standard:

> (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits.

*Id.*, 138 A.2d at 355. In addition, "loss of profits may be projected from past performance" so long as "past performance has continued long enough to the best evidence of damage which is available." *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 491, 270 A.2d 645, 651 (1970).

To prove lost profits, the evidence need only "lay some foundation enabling the fact finder to make a fair and reasonable estimate of the amount of damage." *Della Ratta, Inc. v. American Better Cmty. Devs., Inc.*, 38 Md. App. 119, 143, 308 A.2d 627, 641 (1977). Damages can be ascertained "by reference to some fairly definite standard, such as market value, established experience, or direct inference from known circumstances." *Id.*, 380 A.2d at 641 (quoting 22 Am. Jur. 2d *Damages* § 25). A business may prove lost profit by presenting evidence of its prior earnings. *See Macke Co.*, 259 Md. at 489-91, 270 A.2d at 650-51 (holding that past profits can be used to estimate loss profits but remanding for lower court to assess damages). Thus, a billing services provider successfully proved damages for lost profit with reasonable certainty where it presented an experienced medical billing manager who estimated damages using accepted principles and practices. *Thomas v. Capital Med. Mgmt. Assoc., LLC*, 189 Md. App. 439, 465-66, 985 A.2d 51, 67 (2009); *see Sergeant Co. v. Clifton Bldg. Corp.*, 47

Md. App. 307, 318, 423 A.2d 257 (1980) (holding that collateral lost profits from nine lost contracts for sales of homes arising from breach of contingent financing agreement sufficient to meet the reasonable certainty requirement); *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 329-33, 389 A.2d 887, 906-08 (1978) (affirming an award of lost profits and holding that an expert witness properly appraised the present value of lost profits resulting from the breach with reasonable certainty).

### The Facts Support Plaintiff's Claims For Lost Profits

Applied to the present case, Plaintiff is clearly entitled to proceed to trial on the lost profits claim. Initially, Defendants were fully aware Plaintiff was in the business of government contracting, as Mr. Rossi found and investigated Austin Mohawk learning that they had provided canopies to the government in the past. And, Mr. Rossi also emailed Austin Mohawk, letting them know that Plaintiff believed it would have other NAVFAC gate projects. *See* September 16, 2008 email from Charles Rossi to Susanne Wilson at Austin Mohawk, attached hereto as Exhibit 48. There is, therefore, a jury question (which precludes the entry of summary judgment in favor of Defendants), as to whether it was reasonably foreseeable that a mishap would cause lost revenue for Plaintiff.

### The Testimony Supports Plaintiff's Claims For Lost Profits

Moreover, there is ample evidence in the record from which a jury could conclude that Plaintiff lost other future revenue on other projects because of Defendants' wrongdoing. Steve Krishack testified that Plaintiff lost a $3.5 million NAVFAC sole-source contract that was to be awarded to Plaintiff to design HVAC renovations. *See* S. Krishack Dep. at 125-31, attached hereto as Exhibit 49. Mr. Krishack learned of the lost contract the day after Mr. Halferty's death, when Karen Williams from NAVFAC informed him that the walk-through was no longer "on,"

and "she would not be able to sole source the project or any other projects to Meltech because of the incident." (*Id.* at 127.)

Mr. Krishack also learned from the vice president of Vatica Contracting, a contractor at a specialty firm with whom Plaintiff worked on projects, that NAVFAC no longer wanted to use Plaintiff after Mr. Halferty's death. (*Id.* at 129-31). Specifically, when NAVFAC sought a recommendation for an 8(a) company from Vatica and the vice president recommended Plaintiff to get two year-end sole source contracts, NAVFAC informed Vatica that it could no longer use Plaintiff because of Mr. Halfterty's death. (*Id.* at 130.) Peter Psaromatis from Vatica confirmed Mr. Krishack's testimony. Around 2009 or 2010, Mr. Psaromatis recommended Plaintiff as an 8(a) firm to work on a roof replacement project that was being overseen by Karen Williams. *See* Depo of Peter Psaromatis, at 27-30, attached hereto as Exhibit 50. Although "nobody said anything," Mr. Psaromatis "got the hint to mention another company." (*Id.* at 29.) Divco was awarded these contracts and Plaintiff lost an opportunity to be a part of them.

Plaintiff detailed its lost revenue from NAVFAC. "[O]ver the past 4 years" before Mr. Halferty's death, Meltech had "averaged approx. 2 projects a year at Patuxent Naval averaging over $681,000 each." (Ex. 42 to Krishack's deposition, see Exhibit 49). Good performance by Plaintiff increased the "average up to almost 1 million per contract for the last 2 projects." (*Id.*) After Mr. Halferty's death, however, Plaintiff lost the sole-source $3.5 million HVAC renovation project. (*Id.*) Despite being the low bid on a $4.5 million project to build the Patuxent River Systems Integration Lab, Plaintiff also lost and was told during debriefing that it lost the contract because of Mr. Halferty's death. (*Id.* at 4.)

Against this backdrop, there is a dispute of fact regarding Plaintiff's future damages claim. Defendants argue Karen Williams's testimony demonstrates Plaintiff's own conduct was

the reason Plaintiff lost other contracts.  Mr. Krishack says otherwise.  Karen Williams is not aware of all contracts offered at PAX River and has no knowledge of contracts on which she is not the contracting officer.  *See* Depo of Karen Williams at 82-83, attached hereto as Exhibit 51. Ms. Williams was also not the contracting officer for every job, thus, her testimony is of no moment because it is limited and does not encompass all of the contracts that Plaintiff was eligible for and lost out on.  *Id.*

In fact, what exists presently is Austin Mohawk's mere disagreement with Plaintiff's methodology for calculating lost future business, which is insufficient to defeat summary judgment.  *Dierker v. Eagle National Bank*, the lone case cited by Austin Mohawk, attests that a defendant is not entitled to summary judgment simply because it disagrees with the plaintiff's method for calculating lost profits.  888 F. Supp. 2d, 645, 658 (D. Md. 2012).  In *Dierker*, a mortgage brokerage firm became the branch of a federally-chartered bank, relying on representations by the bank's employees that the bank could handle the mortgages originated by the firm.  *Id.* at 648-49.  When the bank's representations proved to be untrue, the mortgage firm sued, seeking *inter alia* damages for lost profits.  *Id.* at 650, 656-68.

The bank in *Dierker* contended that summary judgment was proper – just as Austin Plaintiff now argues – because it quibbled with the damages calculation advanced by the mortgage firm and faulted the firm for presenting no expert assessment.  *Id.* at 658.  In addition, just as Austin Mohawk does here, the *Dierker* bank tried to confuse the issues before the court on summary judgment by claiming that the mortgage firm's damages were speculative because they failed to account for other possible explanations for the firm's loss in profit.  *Id.*  The *Dierker* Court denied summary judgment and rejected the bank's characterization of the damages as speculative because the mortgage firm properly calculated its lost profit estimates based on

"historical performance," "the average amount" it previously earned per loan, and "the difference" in what it earned before and after it joined the bank. *Id.* This is precisely what Plaintiff has done here.   The *Dierker* Court also held that "*[a]ny alleged flaws in the methodology are the proper subject of cross examination, not the basis for summary judgment.*" *Id.* (emphasis added).  As was the case in *Dierker*, because so many material facts are in dispute concerning the scope of Plaintiff's lost profits, summary judgment is not appropriate.

Under these circumstances, the jury should be allowed to consider the relative strengths and weaknesses of this claim at trial, and Defendant's Motion for Summary Judgment (*see* Defs' Mot. for Summ. Judgment at 16-22), should be denied.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully request that Plaintiff's Motion for Summary Judgment be granted and Defendant Austin Mohawk's and Beechgrove's Moiton for Summary Judgment be denied.

Respectfully submitted,


*/s/ Craig S. Brodsky*
Craig S. Brodsky (Bar #23939)
George S. Mahaffey (Bar # 15083)
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, MD 21201
(410) 783-4000 (phone)
(410) 783-4040 (fax)
csb@gdldlaw.com
gsm@gdldlaw.com
*Attorneys for Plaintiff*

36

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of April, 2013, a copy of the foregoing Cross-Motion for Summary Judgment and Opposition to Defendants Austin Mohawk's and Beechgrove Construction Inc.'s Motion for Summary Judgment was filed with the ECF system, with service being made on the following:

Robert L. Ferguson, Jr., Esq.
Ferguson, Schetelich & Ballew, P.A.
100 South Charles Street, Suite 1401
Baltimore, Maryland  21201-2725
*Attorney for the Defendants*

Michael H. Burgoyne, Esq.
Charles Peoples, Esq.
Thomas, Thomas & Hafer, LLP
Woodholme Center
1829 Reisterstown Road, Suite 200
Baltimore, MD 21208
*Attorney for Third-Party Defendant, Robert White t/a White Construction*

/s/ Craig S. Brodsky
Craig S. Brodsky