DEPOSITION OF CHARLES ALBERT EROH, P.E.
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2012

29 (Pages 113 to 116)

113

1   sling before its use.
2   Q. That you told us about earlier?
3   A. Yes.
4   Q. Do you know whether anyone from Meltech --
5   strike that.
6       Are you familiar with the Webster Gate
7   project?
8   A. I know it's the gate that was erected prior
9   to the PAX River project.
10  Q. Do you know what lifting methods were used at
11  that gate?
12  A. Reportedly, according to the stuff that I
13  read for the preparation of this assignment, it was a
14  lull and a strap.
15  Q. The same lifting method that was used at PAX
16  Gate?
17  A. Yes.
18  Q. And do you know who performed the lifts at
19  Webster Gate?
20  A. It was my understanding that Mr. White
21  performed those lifts.
22  Q. Do you know whether anyone from Meltech

114

1   observed those lifts?
2   A. Meltech was on-site at the time that he was a
3   general contractor. Based on my experience, I would
4   assume that he would have observed those lifts or
5   been -- somebody from Meltech would have been on-site
6   when those lifts were done.
7   Q. Do you know if McTernan was on-site when
8   those lifts were done?
9   A. I believe -- I'd have to go back through the
10  testimony and check.
11  Q. If McTernan observed the lifts at Webster
12  Gate, would that change your opinions in this case in
13  any way?
14  A. No.
15  Q. Why not?
16  A. Because the responsibility for -- the strap
17  broke. The responsibility for the inspection of the
18  strap was with White Construction, Austin Mohawk, and
19  Beechgrove.
20  Q. Now, am I correct that whenever a controlling
21  employer uses a subcontractor, the responsibility for
22  those safety inspections is -- always falls on the

115

1   subcontractor? Or are there cases where the
2   responsibility for the specific safety inspections stay
3   with the general contractor?
4   A. They always stay with the person that's
5   responsible for doing the work.
6   Q. Always?
7   A. Yes.
8   Q. It doesn't depend on the general contractor's
9   degree of control?
10  A. No. It depends on the -- White Construction,
11  Austin Mohawk, and Beechgrove were the erectors. You
12  hire the erector because they're experienced and you
13  want them to perform correctly. They have the
14  expertise to do that properly, and the responsibilities
15  for those inspections and stuff fall within that,
16  within their work scope.
17  Q. And what I'm focusing on is, are there
18  situations where a general contractor can hire a sub
19  but the general contractor still maintains
20  responsibility for the specific safety that in this
21  case you say was passed on to the sub?
22  A. No. I don't think that's -- no.

116

1   Q. It's not possible?
2   A. No. Not in normal construction practice, no.
3   Q. Not in a project like this?
4   A. No.
5   Q. Do you agree that Meltech was responsible for
6   providing a safe work environment in accordance with
7   OSHA and Army Corps of Engineers' safety and health
8   requirements?
9   A. Generally, yes.
10  Q. Is there any part of that statement that you
11  disagree with?
12  A. In general terms, no.
13  Q. Do you agree that Meltech failed to exercise
14  reasonable care in preventing and detecting safety
15  violations in this case?
16  A. No.
17  Q. Why?
18  A. The testimony given that I've reviewed is
19  that Mr. McTernan did at least a walkthrough and made
20  sure that -- did some type of an inspection on the lull
21  and made sure that they were using a strap in
22  accordance with the lifting plan. They had the area

PLAINTIFF'S EXHIBIT 30

DEPOSITION OF CHARLES ALBERT EROH, P.E.
CONDUCTED ON WEDNESDAY, SEPTEMBER 26, 2012

31 (Pages 121 to 124)

121

was given the site safety and health plan?
A. I'm not too sure those are two different documents. Are they?
MR. MAHAFFEY: Question pending?
BY MR. PEOPLES:
Q. My question was, do you know, are you aware of any evidence that Mr. White was given the site safety and health plan?
A. I saw nothing in his testimony that said he received it.
Q. And you're not aware of any other evidence, correct?
A. No.
Q. Correct?
A. Yes.
Q. You agree that McTernan had the authority to inspect and stop work on the site and eliminate any hazards?
A. I mean, McTernan did -- again, my reports reflect McTernan did what he was -- met his obligations to do what he had to do. It was Beechgrove's, Austin Mohawk's, and White's responsibility to inspect the

122

sling.
Q. My question was, do you agree that McTernan had authority to inspect and stop the work and eliminate any hazardous conditions?
A. He met all his obligations to do his inspections.
Q. Mr. Eroh, just answer the question.
MR. MAHAFFEY: I'm going to object.
BY MR. PEOPLES:
Q. Do you agree that Mr. McTernan had authority to inspect and stop work and eliminate any hazardous conditions?
A. He had the authority but not the responsibility, in this particular case with these particular circumstances.
Q. If the sling was protected from the tines in some way -- actually, let me ask you this.
Should the sling have been protected from the tines?
A. Yes.
Q. How should it have been protected?
A. By putting in some type of material that

123

softens the corner.
Q. And if that was done, are you aware of any other -- do you have opinions regarding any other problems with the lifting methods that were used by White?
A. No.
Q. And what is the basis for your opinion that the sling is supposed to be protected in that way?
A. It's -- in my training as a rigging inspector, in the OSHA standards, I believe it says it needs to be protected, and in the ANSI standards, I believe it says it needs to be protected. And if you read most of the manufacturers' instructions on slings, it will tell you that it needs to be protected.
Q. Do you know -- are you aware of any evidence that McTernan had formal training in rigging or rigging inspection?
A. Other than his deposition testimony and that document that identified his qualifications.
Q. What in his deposition testimony indicated to you that McTernan had formal training in rigging?
A. I think when he was asked the questions about

124

that stuff, he didn't deny it.
Q. He didn't deny what?
A. When he was asked the questions about, that he was presented with that document and he didn't specifically say, No, I do not have any training in that.
Q. Are you aware of any evidence that McTernan was familiar with the need to protect the sling?
A. In his deposition testimony, I believe he testified that he didn't know.
Q. Does that affect your opinions in any way?
A. No.
Q. Why?
A. Because he wasn't the person that was doing the work. He was -- Meltech hired Austin Mohawk and Beechgrove, who subcontracted the work to White Construction to erect. They had the responsibility to do it correctly and to do it safely. That's part of their work scope. That's what you hire them to do. You don't hire somebody to -- I'll just leave it there. That's what they hired them to do. That's what their responsibilities were.